IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| LeCEDRICK ABRAMS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACTION 15-0105-WS-M |
| | ) |
| TUBE CITY, IMS, LLC, | ) |
| | ) |
|     Defendant. | ) |

**ORDER**

    This matter comes before the Court on Defendant's Motion for Summary Judgment (doc. 20). The Motion has been briefed and is now ripe for disposition.[1]

**I.    Background.[2]**

    Plaintiff, Lecedrick Abrams, brought this action against his former employer, Tube City IMS, LLC, alleging that he was discharged in retaliation for taking medical leave, in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq.* ("FMLA").

---

    [1]    Both the Local Rules and the Rule 16(b) Scheduling Order require parties to submit courtesy hard copies of filings whose exhibits exceed 50 pages in the aggregate. (*See* doc. 12, ¶ 13(c); Civil L.R. 7(g).) The parties complied with this requirement as to their principal summary judgment briefs; however, defendant neglected to furnish courtesy hard copies of the 70+ pages of exhibits accompanying its Reply (doc. 32).

    [2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in his favor. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] [plaintiff's] version of the facts drawing all justifiable inferences in [his] favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

### A.   History of Abrams' Employment Relationship with Tube City.

Tube City is an imbedded contractor at the SSAB steel mill in Axis, Alabama, where it provides services including slag processing, metal recovery, material handling and logistics. (Kuehnlein Decl. (doc. 22, Exh. A), ¶ 2.)  For example, when scrap metal is delivered to the mill by rail, barge or truck, Tube City is tasked with unloading, sorting, cutting and delivering the scrap to the mill as feedstock for new steel production.  (*Id.*)  Abrams began working for Tube City (or, more precisely, its predecessor) at the mill in March 2006.  (Abrams Decl. (doc. 28, Exh. 1), ¶ 1.)  He was originally hired as a "scarfer" in the slab department, where his job duties involved use of a blow torch to remove defects from slabs of metal.  (Abrams Dep. (doc. 22, Exh. B), at 37, 39.)  Abrams was employed for Tube City in this capacity for a period of four or five years.  (*Id.* at 39.)

In November 2007, Abrams was injured in an automobile accident, following which he missed roughly six or seven weeks of work.  (Abrams Dep., at 43-44.)  In June 2010, Abrams requested and received six weeks off from work to recover from hip surgery.  (*Id.* at 44-45.)  He missed more time from work for medical reasons in late 2010 and returned to work with light duty restrictions, which Tube City initially accommodated.  (*Id.* at 46-47.)  However, Tube City terminated Abrams' employment in February 2011, prompting him to file an EEOC Charge of Discrimination alleging (among other things) that Tube City had fired him for taking medical leave that was protected by the FMLA.  (*Id.* at 47-49; Abrams Decl., ¶¶ 4-5.)  Tube City and Abrams reached a settlement of these claims, pursuant to which Abrams was reinstated to work at Tube City with no loss of seniority or benefits.  (Abrams Dep., at 49-50; Abrams Decl., ¶ 6.)

Abrams returned to work at Tube City on July 5, 2011.  (Abrams Dep., at 50-51.)  Upon reinstatement, Abrams was assigned to the Metal Recovery Department as a "burner" in the Burn Yard.  (Kuehnlein Dep. (doc. 22, Exh. C), at 17-18.)  In that capacity, Abrams' job duties involved cutting scrap metal into pieces for processing at the mill.  (Kuehnlein Decl., ¶ 5.)  After the burner cuts the scrap metal, a crane operator picks up the pieces of scrap and places them in piles or in a dump truck or pallet carrier for transportation to the scrap yard.  (*Id.*)  During the relevant time period, the head of Tube City's Metal Recovery Department was Tom Kuehnlein. (*Id.*, ¶ 3.)  The other two supervisors in that department were Terrell Williams (whose title was metal recovery coordinator) and Zyron Reed (metal recovery leadman).  (*Id.*)  Abrams never

received written discipline or performance evaluations at any time during his employment at Tube City. (Abrams Decl., ¶¶ 2, 3, 14.)

   **B.** ***Abrams' 2014 Medical Leave and Subsequent Termination.***

On May 28, 2014, Abrams requested and received approval from Tube City to take medical leave for another hip surgery. (Abrams Decl., ¶ 6; Abrams Dep., at 54.) Throughout the period of this FMLA leave, Abrams maintained weekly contact with supervisor Zyron Reed in order to keep Tube City apprised of his medical status. (Abrams Decl., ¶ 8.) During these communications in the summer of 2014, Abrams and Reed discussed the possibility of Abrams transferring out of the Burn Yard and into a position in the Shear Department. Reed ultimately confirmed that transfer (with Kuehnlein's approval) on July 28, 2014. (*Id.*, ¶¶ 9-10; doc. 28, Exh. 3.)[3] Abrams returned to work at Tube City following his FMLA medical leave of absence on August 4, 2014. (Abrams Decl., ¶ 10; Abrams Dep., at 57-58.) At that time, Abrams believed he was in "better shape" than when his FMLA leave began; in particular, his physical therapy had been successful, and Abrams was experiencing no further issues with his hip. (Abrams Dep., at 69.)

On Abrams' first day back at work, supervisor Terrell Williams (who oversaw the Shear Department) welcomed him and congratulated him on his "promotion." (Abrams Decl., ¶ 24; Abrams Dep., at 69.)[4] Williams informed Abrams that this transfer would be a good change of jobs, that Williams was proud to have him in the Shear Department, and that the transfer had been done in recognition of Abrams' hard work, good attitude, productivity and excellent job performance in the Burn Yard over the years. (Abrams Decl., ¶ 24; Abrams Dep., at 69.) As supervisor for the Burn Yard, Reed no longer directly supervised Abrams following the latter's transfer to the Shear Department, which was geographically some distance from the Burn Yard.

---

   [3] The record is silent as to why Abrams desired a transfer into the Shear Department. From the information before the Court, there is no indication and no reason to believe that he sought such a transfer as an accommodation for his medical condition.

   [4] The Court perceives no record basis for plaintiff's characterization of his reassignment from the Burn Yard to the Shear Department as a "promotion," rather than a lateral transfer. Indeed, plaintiff identifies no evidence that compensation and benefits were superior in the Shear Department, that job requirements and working conditions were materially more favorable in the Shear Department, or that Shear Department assignments were (objectively or subjectively) viewed by Tube City employees as more desirable than Burn Yard assignments.

(Abrams Decl., ¶¶ 25-26, 28.)  Rather, Abrams reported directly to Williams (and not Reed) from August 4, 2014 onward.  (*Id.*)  Upon transferring to the Shear Department, Abrams was assigned a new locker, used different restroom facilities, clocked in and out at a different time clock, and worked a different schedule than he had done when he worked in the Burn Yard.  (*Id.*, ¶¶ 27-28.)  Nonetheless, both the Burn Yard and the Shear Department were part of the Metal Recovery Department, headed by Kuehnlein.  (Abrams Dep., at 75, 105.)  As Kuehnlein explained, "[t]he shears are a different area but they are still burners …. I believe the burn yard was doing the same process.  Yeah, I think we had burners running with each group and you had four different crews."  (Kuehnlein Dep., at 19.)

Abrams' employment in the Shear Department was short-lived.  On August 17, 2014, less than two weeks after Abrams came back to work from FMLA leave, Kuehnlein notified him that his employment at Tube City was being terminated pursuant to a reduction in force (the "RIF"). (Abrams Decl., ¶¶ 29-30.)  In fact, Abrams was one of four Tube City employees in the Metal Recovery Department to be laid off in August 2014 because of a production slowdown in the steel industry and concomitant decrease in work for Tube City at the SSAB mill location. (Kuehnlein Decl., ¶ 6; Kuehnlein Dep., at 25-26.)[5]  The operational circumstances prompting the layoff decision were that, because of a downturn in business at the SSAB mill, Tube City no longer needed as many burners in the Metal Recovery Department as it employed.  (Doc. 28, Exh. 6, at # 12.)

The other three employees selected for the RIF were Ronny Reed, Justin Reed, and Lee Davison, all of whom had been assigned to the Burn Yard.  (*Id.*, ¶ 8; Abrams Decl., ¶ 31.)  None of those individuals had taken FMLA leave during their employment at Tube City.  (Abrams Dep., at 74.)  All four laid-off employees worked as burners in the Metal Recovery Department, although Abrams was the only one assigned to the Shear Department side, rather than the Burn Yard side.  (*Id.* at 75-76.)  Following Abrams' layoff, Tube City reassigned an employee named Ricky Preston from the Burn Yard to the Shear Department to assume Abrams' job duties. (Abrams Decl., ¶ 33.)

---

[5]  At various places in its filings, Tube City has characterized the termination of Abrams and three other burners as a "temporary layoff."  It is undisputed, however, that Tube City did not recall any of the employees laid off in the August 2014 RIF.  (Reed Dep., at 32.)

C.  **The Reduction-in-Force Selection Process.**

Plaintiff has challenged neither the legitimacy nor the business necessity of Tube City's decision to eliminate four burner positions via RIF in August 2014. For summary judgment purposes, then, the Court will accept as true that Tube City had a legitimate business reason to implement a RIF in the Metal Recovery Department. The critical factual question animating the Complaint is why Abrams was one of the four burners selected for layoff, particularly so swiftly on the heels of his return to work from FMLA leave less than two weeks earlier. Plaintiff's theory is that Tube City selected him for inclusion in the August 2014 RIF in retaliation for his exercise of FMLA rights. For that reason, the record facts concerning Tube City's RIF selection process, and its specific grounds for selecting Abrams as one of the four employees to be laid off, are of central importance.

At the time of the RIF, Tube City employed 17 burners (including Abrams) in the Metal Recovery Department at the SSAB mill. (Kuehnlein Decl., ¶ 7.) To select four of those 17 for layoff, Tube City considered the following factors: "seniority, productivity, performance, and ability and experience in performing other jobs at the site." (Doc. 28, Exh. 6, at #12.) According to Tube City, "[b]ased on these criteria and the application of these criteria to the burners at issue, Plaintiff was chosen to be included in the temporary layoff." (*Id.*)[6] The decision of which four burners to terminate was made by Kuehnlein, with the input and recommendations of Zyron Reed (who supervised the Burn Yard) and Terrell Williams (who supervised the Shear Department). (Kuehnlein Decl., ¶ 9.) In that regard, Kuehnlein instructed Reed and Williams to assess the staff, then met with them in his office a couple of weeks before the layoff to discuss the list of RIF candidates. (Kuehnlein Dep., at 27-28, 84-85.) Although he made the layoff decision, Kuehnlein "relied on input and recommendations" from Reed and Williams.

---

[6]   Notwithstanding Tube City's admission in written discovery that the RIF was performed in accordance with these factors, Kuehnlein attempts to reframe the selection criteria in his summary judgment declaration, by asserting that Abrams was chosen "based on an evaluation of his attitude, disposition, work ethic, qualifications and ability to operate multiple pieces of heavy machinery, and cross-training potential." (Kuehnlein Decl., ¶ 10.) Of course, a defendant in an employment discrimination case cannot properly assert in discovery that the plaintiff was selected for layoff based on one set of reasons, then argue in summary judgment that he was chosen based on a different set of reasons. Rather, for summary judgment purposes, Tube City will be held to the specific list of layoff selection criteria identified in its responses to interrogatories.

(Kuehnlein Decl., ¶ 9.)  Kuehnlein states that he accepted the recommendation of Reed and Williams that Abrams be selected for layoff.  (*Id.*, ¶ 17.)

### D.     *Application of RIF Selection Criteria to Abrams.*[7]

With respect to seniority, a spreadsheet prepared by Tube City and identifying the hire dates for all burners under consideration in the RIF confirms that Abrams was senior to the other 16 candidates.  (Doc. 28, Exh. 5; Abrams Dep., at 63.)  According to the chart, as of August 2014 (when the layoff was performed), Abrams had nearly eight and a half years of seniority at Tube City.  (Doc. 28, Exh. 5.)  By contrast, seven of the other 16 burners in the Metal Recovery Department had three or fewer years of seniority, and 10 of those 16 had four or fewer years of seniority (*i.e.*, less than half of Abrams').  (*Id.*)  The other three burners selected for layoff had seniority of 38 months (Justin Reed), 23 months (Lee Davison), and 6 months (Ronny Reed, Jr.), as compared to the 101 months of seniority held by Abrams. (*Id.*)

As for productivity, Kuehnlein avers that Reed informed him that Abrams was among the bottom four burners in terms of productivity.  (*Id.*, ¶ 13.)  Reed avers that he evaluated productivity by monitoring the amount of scrap that each burner processed on a tons per hour basis, and that by this metric Abrams' productivity placed him in the bottom four.  (Reed Decl. (doc. 22, Exh. E), ¶ 9.)  However, plaintiff's evidence (which must be accepted as true for summary judgment purposes) is that Reed informed Abrams that Abrams had earned his transfer to the Shear Department as "one of the most productive burners in the Burn Yard."  (Abrams Decl., ¶ 13.)  Plaintiff's evidence is also that he processed more scrap on a daily basis than any other worker did.  (*Id.*, ¶ 22.)  Accepting Tube City's construct that productivity equates to amount of scrap processed,[8] it would have been helpful to examine business records documenting each burner's quantity of scrap processed on a daily, weekly or monthly basis.

---

[7]     As noted, the Federal Rules of Civil Procedure require all evidence and factual inferences to be viewed in the light most favorable to the non-movant on summary judgment review.  This bedrock principle looms large here.  With respect to particular RIF selection criteria, Abrams' evidence is frequently at odds with – and, indeed, directly contrary to – that of Tube City.  In accepting Abrams' version of the facts for summary judgment purposes, the Court neither discredits Tube City's evidence nor expresses any opinion as to either side's credibility.

[8]     Such a formulation may or may not be accurate given the evidence that at least some burners engage in other substantial activities (such as crane operation) besides cutting scrap metal into pieces.  (Kuehnlein Dep., at 19-20.)

However, Tube City maintains no such records and prepares no such reports on an employee-specific basis; rather, Reed simply relied on his own observations. (Reed Dep., at 23, 25, 39.)[9] As it stands, there is conflicting record evidence as to both Abrams' actual productivity and Reed's perception of Abrams' productivity.

The performance criterion must be considered in light of plaintiff's substantial showing that he had performed at a high level in the Burn Yard. Indeed, plaintiff's evidence is that he had occupied a position of trust and leadership for Tube City. To that effect, Reed repeatedly referred to Abrams as his "right hand man," and entrusted him with carrying the radio and operating the crane. (Abrams Decl., ¶ 11.) Abrams was a "shift leader" and the "go-to guy" to whom other burners reported when they needed help. (*Id.*, ¶ 36.) Plaintiff's evidence is that Reed notified at least one other employee in the Burn Yard that Abrams was a shift leader. (Finley Dep. (doc. 28, Exh. 19), at 45.) Abrams carried a radio on his collar during the night shift (the only employee to do so) and carried Reed's radio when the latter was not present, such that "it was known that he was the guy to go to." (*Id.* at 45-46.)[10] Reed's esteem for Abrams was shared by Williams, who informed Abrams on August 4, 2014 that he was glad to see Abrams back, and that Abrams "was doing a good job." (Abrams Dep., at 69.) Moreover, Williams informed Abrams that his transfer to the Shear Department was the product of Abrams' excellent job performance and productivity in the Burn Yard. (Abrams Decl., ¶ 24.)

Once again, the supervisors' purported oral characterizations of Abrams' responsibilities and overall job performance cannot be confirmed or refuted by written records for the simple reason that such materials do not exist. For example, Tube City did not complete periodic written performance evaluations for Abrams or any other burners. (Kuehnlein Dep., at 28; Reed Dep. at 30.) Abrams never received a written evaluation during his eight-plus years of

---

[9] More generally, Tube City acknowledges that its "records are in terrible condition." (Kuehnlein Dep., at 35.) That fact places movant at a disadvantage on summary judgment, not because Rule 56 or the FMLA mandates that employers maintain written performance and productivity records for employees (they do not), but because it repeatedly invites he-said/she-said factual debates with respect to key RIF selection metrics. Diligent documentation and enlightened record-keeping practices might have positioned Tube City far differently on summary judgment.

[10] Again, this account is contested by Tube City, whose opposing evidence is that Abrams was never a shift leader and never carried a radio. (Reed Dep., at 32.)

employment at Tube City.  (Abrams Decl., ¶ 3.)  Tube City does maintain written disciplinary records; however, plaintiff's evidence is that Abrams was one of the only RIF candidates in the Metal Recovery Department who had never been the subject of formal discipline.  (*Id.*, ¶ 14.)[11]  The summary judgment record includes documentation of written disciplinary action (including suspensions and "last chance agreements") taken by Tube City against various other burners who were eligible, but not selected, for the August 2014 RIF.  (*See* doc. 28, Exhs. 7-17.)[12]

Embedded in the concept of performance is Abrams' willingness (or lack thereof) to perform overtime work.  Plaintiff's evidence is that Abrams worked overtime every time Reed asked him to do so.  (Abrams Decl., ¶ 15.)  Yet during the RIF meeting, Reed informed Kuehnlein that Abrams had "refused overtime."  (Reed Decl., ¶ 7; Reed Dep., at 34.)  Taking the evidence in the light most favorable to Abrams, no such refusals ever happened.

Finally, with respect to the criterion of "experience in performing other jobs at the site," plaintiff's evidence is that Abrams had worked in four departments (Shear Department, Burn Yard, Maintenance Department and Slab Yard), in multiple capacities (scraper, scarfer, slitter, crane operator, excavator crane operator), and operating a wide variety of equipment (track torch, three hole torch, dump truck, Liebherr crane, Sennebogan crane) at Tube City's facilities at the SSAB mill.  (Abrams Decl., ¶ 36; Abrams Dep., at 109-10.)  Plaintiff's evidence is that

---

[11]     That said, Kuehnlein and Reed had spoken with Abrams (but did not discipline him) for unsafe operation of the crane when Abrams was in training.  (Reed Dep., at 16; Kuehnlein Dep., at 81-82.)  Plaintiff's evidence is that this was an isolated incident based on a "mistake" he had made, but that Abrams continued operating the crane on his shift thereafter.  (Abrams Dep., at 111.)  And Kuehnlein reported that Reed and Williams had also warned Abrams when problems arose as to equipment on which Abrams was being trained, in circumstances involving "hand eye coordination … and smoothness, consistency."  (Kuehnlein Dep., at 83.)  However, this was not formal disciplinary action; indeed, Reed testified, "We don't discipline."  (Reed Dep., at 12.)

[12]     By way of example, Richard Klein received written discipline from Kuehnlein on November 14, 2013 for failure to report a known safety defect.  (Doc. 28, Exh. 8.)  Chris James received a seven-day suspension and "last chance agreement" on November 14, 2013 for property damage and failure to report through the proper chain of command.  (Doc. 28, Exh. 9.)  Jesse Weaver received a two-day suspension in December 2010 for being a no-call, no-show for work.  (Doc. 28, Exh. 12.)  Ricky Preston received a three-day suspension and was "disqualified from operations" on May 24, 2012 for backing the water truck into a pile of slabs.  (Doc. 28, Exh. 14.)  All of these employees were on the list of eligible RIF candidates in August 2014, but none were selected, whereas Abrams (who had no written discipline) was chosen.

Abrams was the only crane operator on the night shift in the Burn Yard, and that he operated the crane on nearly every shift he worked. (Abrams Dep., at 110; Abrams Decl., ¶ 12.)[13] A witness who worked in the Burn Yard indicates that he personally saw Abrams operate the crane on at least 200 occasions, and that Abrams taught other Tube City employees how to operate the crane. (Finley Decl. (doc. 28, Exh. 18), ¶¶ 6, 7.) According to plaintiff's evidence, Reed specifically stated that Abrams was "a good crane operator" who unloaded rail carts, scrap bins and flatbed trucks better than any of the other operators. (Abrams Decl., ¶ 20.) While plaintiff was not certified to operate the crane, there was no requirement that burners be certified to operate heavy equipment in order to survive the RIF; indeed, Tube City's evidence is that burners were retained who were not so certified. (Kuehnlein Decl., ¶ 15.)

## II. Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual

---

[13] By contrast, Reed's testimony is that Abrams never operated the crane on the night shift. (Reed Dep., at 17.) Again, plaintiff's narrative is accepted as true for summary judgment purposes.

determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted); *see also Williamson v. Clarke County Dep't of Human Resources*, 834 F. Supp.2d 1310, 1318 (S.D. Ala. 2011) (recognizing and applying rule that summary judgment standard is applied equally in employment discrimination cases as in other kinds of federal actions).

### III. Analysis.

#### A. *Relevant Analytical Framework.*

Plaintiff's sole cause of action is a claim for retaliation under the FMLA. The law is clear that an employer may not retaliate against an employee for exercising rights provided by the FMLA. *See, e.g., Jarvela v. Crete Carrier Corp.*, 776 F.3d 822, 832 (11th Cir. 2015) ("The FMLA prohibits an employer from discriminating against an employee for exercising a right under the FMLA."); *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 798 n.5 (11th Cir. 2000) ("the substance of the FMLA provisions as they concern this case is that an employer may not do bad things to an employee who has exercised or attempted to exercise any rights under the statute"). To prevail on his FMLA retaliation claim, Abrams "[e]ssentially … must show that []he suffered an adverse employment action that was motivated by an impermissible retaliatory or discriminatory animus." *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010) (citation and internal quotation marks omitted).

Where, as here, a plaintiff offers no direct evidence of retaliatory intent, courts analyze FMLA retaliation claims through the familiar lens of the *McDonnell Douglas* burden-shifting framework.[14] "To establish a *prima facie* case of retaliation under the FMLA, an employee must

---

[14] *See Rudy v. Walter Coke, Inc.*, 613 Fed.Appx. 828, 830 (11th Cir. June 2, 2015) ("Absent direct evidence of the defendant's intent, courts evaluate FMLA retaliation claims under the burden-shifting framework set forth in *McDonnell Douglas*"); *Hawkins v. BBVA Compass Bancshares, Inc.*, 613 Fed.Appx. 831, 840 (11th Cir. June 2, 2015) (similar); *Giles v. Daytona State College, Inc.*, 542 Fed.Appx. 869, 874 (11th Cir. Oct. 25, 2013) ("In an FMLA (Continued)

show that, (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment decision, and (3) the decision was causally related to the protected activity." *Jarvela*, 776 F.3d at 832 (citation and internal marks omitted).  Once the employee establishes a *prima facie* case of retaliation, the burden shifts to the employer "to articulate a legitimate reason for the adverse action."  *Martin v. Brevard County Public Schools*, 543 F.3d 1261, 1268 (11th Cir. 2008) (citation omitted).  If the employer does so, then the burden shifts back to the employee to "show that the employer's proffered reason was pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  *Id.* (citation and internal quotation marks omitted).

In its Motion papers, Tube City asserts that it "assumes for purposes of summary judgment" that Abrams can make out a *prima facie* case of FMLA retaliation.  (Doc. 21, at 14.)  Such an "assumption" is well grounded in record facts.  It appears beyond reasonable dispute that Abrams' leave of absence from May 28, 2014 until August 4, 2014 for hip surgery was within the ambit of the FMLA's protections.  Tube City's termination of Abrams' employment plainly qualifies as an adverse employment decision.  And the timing of that termination decision, which was implemented just 13 days after Abrams' return from FMLA leave, unquestionably satisfies the "causal connection" prong of the *prima facie* inquiry.  *See, e.g., Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) ("Close temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.") (citation and internal quotation marks omitted); *Strickland v. Water Works and Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001) (as a general proposition, short time lapse between FMLA leave and termination decision "constitutes circumstantial evidence that the [employer] was retaliating against [employee] for seeking FMLA protection and thus satisfies the third element of a *prima facie* case").

---

retaliation case, unless there is direct evidence of the employer's retaliatory intent, we employ the *McDonnell Douglas* burden-shifting framework.").

The burden thus shifts to Tube City to articulate a legitimate non-retaliatory reason for Abrams' selection in the August 2014 reduction in force.[15] Tube City satisfies this modest burden here. In particular, defendant alleges that plaintiff was included in the RIF pursuant to an "evaluation of his attitude, disposition, work ethic, qualifications and ability to operate multiple pieces of heavy machinery, and cross-training potential." (Doc. 21, at 15-16.) Defendant further states that Abrams' supervisors "found his job performance to be inferior as compared to the other burners" with respect to (i) "poor attitude, disposition and work ethic," such as refusal to work overtime and taking extended breaks; (ii) inferior productivity in terms of amount of scrap processed; (iii) not being certified to operate the crane or other heavy equipment; and (iv) lack of skills to operate heavy machinery. (*Id.* at 16-17.) Such an articulation, supported by record evidence, suffices to discharge defendant's burden of production.

### B.      Pretext.

The summary judgment analysis in this case, as in so many other employment discrimination cases, thus turns on pretext. For purposes of a pretext analysis, courts decide "whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Ezell v. Wynn*, 802 F.3d 1217, 1227 (11th Cir. 2015). To satisfy his burden of showing pretext, "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [his] business judgment for that of the employer." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (citation omitted). "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Id.* at 1266. The issue is not whether the employer's decision was wise or accurate, prudent or fair; rather, "our sole concern is whether unlawful discriminatory animus motivated the decision." *Id.* (citation and internal marks omitted). In order to satisfy his burden

---

[15]    In its principal brief, Tube City misstates the inquiry by asserting that "a RIF instituted due to a downturn in business is a legitimate, non-retaliatory reason for termination." (Doc. 21, at 14.) The relevant question here is not whether the RIF itself was legitimate, but whether Tube City's reasons for selecting Abrams as one of the four burners (culled from a field of 17) in that RIF were legitimate and non-retaliatory.

at the pretext stage, "[t]he employee may rely on evidence that he already produced to establish his *prima facie* case." *Martin*, 543 F.3d at 1268.

Here, Abrams has made a strong showing of pretext by using a collage of record facts that, if believed by the finder of fact, undermine Tube City's stated reasons for selecting him in the RIF and suggest that the real reason was FMLA retaliation. For starters, the inordinately brief interval (just 13 days) between Abrams' return from FMLA leave and his discharge is evidence of pretext. *See, e.g., Hurlbert*, 439 F.3d at 1298 (close temporal proximity between FMLA-protected activity and the adverse employment action "is evidence of pretext, though probably insufficient to establish pretext by itself"). Moreover, defendant's inconsistencies and recasting of its RIF selection criteria during this litigation is also evidence of pretext. *See id.* ("[A]n employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext."). In written discovery responses, Tube City documented the selection criteria as being "seniority, productivity, performance, and ability and experience in performing other jobs at the site." (Doc. 28, Exh. 6, at #12.) Yet on summary judgment, defendant says the relevant factors were "attitude, disposition, work ethic, qualifications and ability to operate multiple pieces of heavy machinery, and cross-training potential." (Kuehnlein Decl., ¶ 10.) Most notably, defendant's principal brief on summary judgment fails to acknowledge the role of seniority in the RIF selection process. Perhaps this was an innocent oversight, or perhaps the omission was because Abrams had more seniority than any of the other 16 candidates for the August 2014 RIF. Either way, Tube City has not addressed why its list of RIF criteria presented on summary judgment appears to diverge in material respects from that identified in discovery. Whatever the reason, defendant's shifting explanation of what criteria it used in carrying out the RIF is evidence of pretext.[16]

---

[16] To be sure, defendant remarks on summary judgment that "[a]n employer is entitled to choose the criteria it considers in determining which employees should be selected for inclusion in a RIF" and that Tube City "was free to place whatever weight it wanted on seniority." (Doc. 21, at 21.) These statements are undoubtedly true. Tube City was free to structure its RIF decision however it wished, so long as it did not rely on unlawful considerations. If Tube City wanted to conduct a RIF without regard to seniority, it was entitled to do so. In written discovery, however, Tube City listed seniority first among the criteria it used in administering the August 2014 RIF. Having done so, and given Abrams' primacy in seniority rankings among eligible employees, defendant's failure on summary judgment even to identify seniority as a selection criterion, much less to explain why application of that criterion (along (Continued)

More broadly, defendant's stated productivity- and performance-related reasons for selecting Abrams in the RIF rest on factual characterizations that are hotly contested in the record.  On summary judgment, it is Abrams' version of the facts, not Tube City's, that controls.  Plaintiff's evidence is that Abrams processed more scrap on a daily basis than any other worker in the Burn Yard, that Reed lauded him as one of the most productive burners, that Abrams was a "shift leader" and the "go-to guy" to whom other burners reported when they needed help, that Reed referred to Abrams as his "right hand man" and let him carry the radio when Reed was not there, that Williams notified Abrams shortly before the August 2014 RIF that Abrams was being transferred to the Shear Department because of his excellent job performance and productivity, that Abrams (in contrast to many other RIF candidates, several of whom had received significant formal discipline, including suspensions and last-chance agreements) had never received written discipline, and that Abrams had never refused to work overtime when Reed requested that he do so.  Taken in the aggregate, such evidence raises a reasonable inference that Tube City's stated reasons for selecting Abrams in the RIF (*i.e.*, that he had a poor attitude, took extended breaks, refused to work overtime, ranked near the bottom in terms of scrap processed, and was a relatively poor performer) are false.[17]

---

with the others) resulted in Abrams' selection is, at best, incongruous.  Further, seniority appears to have been a real factor in the selection process, as the other three laid-off employees ranked 10th, 14th and 16th out of the 17 burners in terms of seniority.  If seniority mattered for selection of the other three employees, why did it not matter as to Abrams?  A reasonable factfinder observing this inconsistency could deem Tube City's stated rationale for Abrams' selection unworthy of credence.  It thus qualifies as evidence of pretext.

[17]   In response, defendant balks that Abrams' own views of his performance are irrelevant, that only Tube City's perception of his performance matters, and that neither plaintiff nor this Court may substitute its business judgment for that of the employer.  (*See, e.g.*, doc. 21, at 18-25; doc. 38, at 1-2, 7-13.)  These statements are accurate characterizations of the law; however, they are unavailing for Tube City on summary judgment.  Plaintiff's evidence is that Reed and Williams told him he was an excellent performer and one of the most productive burners.  Reed and Williams are the very supervisors on whom Kuehnlein relied in selecting employees for the August 2014 RIF.  Similarly, plaintiff's evidence is that he never refused to work overtime whenever Reed asked him to do so.  If that were so, then it is hard to imagine how Reed (and hence Kuehnlein, in reliance on Reed) could have had a good-faith belief that Abrams had refused to work overtime.  Plaintiff's evidence is that he was a shift leader in the Burn Yard, and the burner to whom all of his co-workers looked for help whenever problems or issues arose.  If that were so, then it would be difficult to imagine how Tube City supervisors and managers (Continued)

With respect to the criteria of "ability to operate multiple pieces of heavy machinery, and cross-training potential," Tube City's position is that Abrams lacked aptitude on the crane and therefore lacked skills for cross-training on heavy equipment. But plaintiff's evidence is that Abrams operated the crane literally hundreds of times, on nearly every shift he worked; that he was the only employee to do so on his shift; that he taught other employees how to operate the crane; and that Reed specifically acknowledged that Abrams was a good crane operator. Such evidence, if accepted as true, belies Tube City's explanation that it selected Abrams for the RIF because he "was not proficient in operating the crane" and had failed to "demonstrate[] the skills necessary to be trained to operate heavy equipment." (Kuehnlein Decl., ¶¶ 14-15.)[18]

---

would be ignorant of Abrams' leadership role, particularly where Reed praised Abrams as his "right hand man." And Abrams' lack of formal discipline, juxtaposed against the significant/serious disciplinary records of other RIF candidates, raises a genuine issue of material fact as to whether Tube City decision makers really believed Abrams to be a relatively poor performer with a bad attitude (*i.e.*, if they did, then how come they only disciplined other employees, not Abrams?). The point of all of this is not that Abrams "disagrees" or "quibbles" with his employer's characterization of his performance. The point is that if plaintiff's evidence is accepted as true, then Abrams worked in a manner that Tube City supervisors and managers knew was irreconcilable with the "poor performer" narrative. If plaintiff's evidence is accepted as true, then Reed and Williams (on whose opinions the decision maker relied) had praised Abrams' leadership, performance and productivity in the Burn Yard. If plaintiff's evidence is accepted as true, then a reasonable inference exists that Tube City was not really concerned about matters like extended breaks or a "mistake" on the crane (because it never disciplined Abrams even though it did discipline his co-workers for both more and less serious infractions), such that its reliance on such trifling facts as grounds for his termination was mere pretext. In sum, if plaintiff's evidence is accepted as true, a reasonable fact finder could conclude that Tube City believed Abrams was an excellent performer and laid him off anyway on the basis of a trumped-up pretext that he was not a very good worker, all in retaliation for his having very recently taken FMLA leave.

[18]   Defendant's efforts to rebut this evidence are not persuasive. For example, defendant argues that "it is undisputed that he was not certified to operate the crane." (Doc. 32, at 13.) But defendant cites no evidence explaining why certification mattered, particularly given defendant's admission that other burners retained in the RIF lacked that certification. Defendant also protests that Kuehnlein "was only aware of him operating the crane on a handful of occasions." (Doc. 32, at 14.) Again, plaintiff's evidence is that Abrams operated the crane on literally hundreds of occasions, on virtually every shift he worked, and that he was the only employee to do so. Perhaps a reasonable jury would believe that Kuehnlein (head of the Metal Recovery Department) had no idea who was operating the crane on the night shift in the Burn Yard. But the jury would not have to believe that, especially given Abrams' evidence that his
(Continued)

Put it all together, and here's what the evidence looks like from plaintiff's perspective. Abrams was a star performer, a leader in the Burn Yard, the most senior burner in the Metal Recovery Department, the only crane operator on his shift, praised by his supervisors as reliable and productive, experienced in performing many other jobs in other departments at Tube City's facilities, and with a pristine disciplinary record. He took more than two months of FMLA leave from late May 2014 until early August 2014. Thirteen days after he returned to work, Abrams was laid off under a RIF whose ostensible criteria were seniority, productivity, performance, and ability and experience in performing other jobs at the site. What's more, the termination decision was made a couple of weeks before the RIF (*i.e.*, just as plaintiff was coming back to work from FMLA leave). Plaintiff's evidence is sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision, and that the real reason was retaliation for his exercise of FMLA leave.[19]

---

direct supervisor had praised him as a good crane operator, and the common-sense notion that department managers would be aware of who was operating heavy equipment in their absence. Once again, this is not a matter of quibbling with the employer's reasons or acting as a super-personnel department; rather, these concerns go directly to whether the employer actually believed and was motivated by its stated reasons, and are indicative of the sort of implausibilities, inconsistencies and contradictions that may qualify as pretext.

[19]     In so concluding, the Court has carefully considered defendant's many counterarguments expressed in summary judgment briefing. For example, Tube City argues that "[t]he mere exercise of FMLA rights does not immunize an employee from being laid off pursuant to a RIF." (Doc. 32, at 4.) That is true, but it does immunize the employee from being laid off <u>because</u> he exercised FMLA rights. Plaintiff's evidence, taken in the aggregate, supports a reasonable inference that that is precisely what Tube City did. Defendant asserts that the inclusion of three other burners in the RIF who had not taken FMLA leave "negates any claim of retaliatory intent." (*Id.* at 15.) Not so. Plaintiff's theory is not that the RIF itself was a fabrication to rid Tube City of FMLA users; rather, his theory is that he was improperly selected for the RIF because of his FMLA status. That the other three laid-off burners had not taken FMLA leave is not antithetical to (and may not even be probative to rebut) plaintiff's assertion that he was chosen for that RIF for unlawful reasons. Next, defendant insists that "the mere absence of documentation does not establish pretext or retaliatory intent." (*Id.* at 5.) That statement is correct, but it cannot help Tube City's Rule 56 Motion. As noted *supra*, the problem with the lack of documentation is that it makes Tube City vulnerable to arguments by employees that their direct supervisors told them they were doing a great job, they had never been disciplined, and so on, without having any paper trail to rebut it. Stated differently, defendant's position that Abrams was laid off for being a relatively poor performer would be stronger if records in a personnel file corroborated that assessment. Without such documentation, Tube (Continued)

**IV.     Conclusion.**

For all of the foregoing reasons, defendant's Motion for Summary Judgment (doc. 20) is **denied**.  This case remains set for Final Pretrial Conference on **April 12, 2016**, at **2:00 p.m.**, with jury trial to follow during the **May 2016** civil term.

DONE and ORDERED this 16th day of February, 2016.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

City must defend a case based on conflicting evidence of what its supervisors said or observed. The absence of corroborating documents does not prove pretext, but it places an employer in a weakened evidentiary position.  Similarly, defendant's suggestion that its selection of Abrams was motivated (at least in part) by incidents in which he refused overtime, showed a bad attitude, operated equipment badly and the like is undermined by the fact that Tube City never disciplined Abrams for any of these incidents, whereas it did discipline other burners for everything from untucked shirts to major property damage.  The failure to discipline Abrams supports an inference that Tube City did not view those incidents as a big deal (if they happened at all), thereby casting doubt on whether Tube City really relied on them as grounds for choosing Abrams for layoff over coworkers who had much more extensive disciplinary records.  Contrary to defendant's characterization, this is not an "attempt to substitute [plaintiff's] business judgment for that of" Tube City.  (Doc. 32, at 8.)  Rather, the Court is merely recognizing the presence of substantial evidence casting doubt on whether Tube City actually was motivated by the reasons it says it was in selecting Abrams for layoff.  Finally, defendant's argument that the lack of evidence that any Tube City supervisor ever criticized Abrams for taking FMLA leave "undercuts any effort by Plaintiff to prove retaliatory intent" is incorrect as a matter of law.  (Doc. 32, at 14.)  In a circumstantial case such as this, a plaintiff may prove retaliatory intent (and, more importantly, reach a jury on the question of retaliatory intent) in the absence of any direct evidence.  Indeed, that is the entire premise on which the *McDonnell Douglas* framework is founded.  *See generally Alvarez*, 610 F.3d at 1264 ("A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or statistical proof.") (citation omitted).